NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 12a0344n.06

No. 10-6036

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED

*Mar 29, 2012*

LEONARD GREEN, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE EASTERN |
| | ) | DISTRICT OF TENNESSEE |
| JOHN THEODORE HANCOCK, | ) | |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |

BEFORE:  SUHRHEINRICH, STRANCH and DONALD, Circuit Judges.


SUHRHEINRICH, Circuit Judge.  Defendant John Theodore Hancock, M.D., appeals from his judgment of conviction and sentence on various health care fraud charges.  We **AFFIRM.**

## I.  Background

Defendant operated a medical business known as "Hancock Family Medicine" in Mooresburg, Tennessee.  Defendant prescribed controlled substances, including methadone, morphine, oxycodone (OxyContin), hydrocodone, and benzodiazepines, for patients without performing physical examinations and without determining whether the drugs were medically necessary.  Most of the drugs were paid for through the TennCare program, Tennessee's program for indigent medical care.  Several of Defendant's patients died.

Defendant was charged with health care fraud, drug offenses, money-laundering, and income tax violations.  Specifically, Counts 1 through 32 of the superseding indictment charged Defendant

-1-

with engaging in a scheme to defraud a health care benefit program, in violation of 18 U.S.C. § 1347. Counts 1, 2, 18, and 19 further charged that Defendant's fraud resulted in death. Counts 33 through 105 charged Defendant with unlawfully dispensing, or causing to be dispensed, controlled substances, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(C), (b)(1)(D), and (b)(2), and Counts 33 through 36 further charged that deaths resulted from the unlawful dispensing. After a ten-day jury trial, Defendant was convicted of: twenty-nine counts of defrauding the TennCare program, with the conduct charged in two counts resulting in death–Evelyn Lindsey (Count 1) and James Brogan (Count 2); twenty-nine counts of unlawfully dispensing Schedule II controlled substances–oxycodone, morphine, methadone, and fentanyl–outside the scope of accepted medical practice and not for a legitimate medical purpose with the conduct in three counts resulting in death (including Lindsey and Brogan) (Counts 33 through 35); nine counts of unlawfully dispensing Schedule III controlled substances (hydrocodone with acetaminophen); twenty-nine counts of unlawfully dispensing Schedule IV controlled substances; two counts of money laundering; one count of tax evasion; and four counts of failure to file income tax returns. The jury returned not guilty verdicts on five counts involving patient Chester Thacker.

Defendant filed a motion for new trial, and later an amended motion for new trial and judgment of acquittal, arguing that the evidence was insufficient for Counts 33 through 35–unlawfully dispensing controlled substances which resulted in the deaths of three patients, including Lindsey and Brogan, absent proof that their deaths were actually caused by the prescription drug that was prescribed to them by Defendant. The district court denied the motions, holding that the record contained sufficient evidence from which a jury could find proximate cause between Defendant's unlawful dispensing of controlled substances and the victims' deaths.

Defendant was sentenced to an aggregate term of 276 months' imprisonment: concurrent terms of 276 months for health care fraud resulting in death; 120 months for the remaining health care fraud counts and money laundering; 240 months for the unlawful dispensing of Schedule II controlled substances; 60 months for the unlawful dispensing of Schedule III controlled substances and tax evasion; 36 months for the unlawful dispensing of Schedule IV controlled substances; and 12 months for the failure to file income tax returns. Defendant was also ordered to serve five years of supervised release and pay restitution of $70,764.02. He then filed this appeal.

## II. Analysis

Defendant argues on appeal that there was insufficient evidence to support his convictions for health care fraud that resulted in death. In determining whether there is sufficient evidence to support a conviction, the question before us is whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). We review the relevant evidence in the light most favorable to the Government and must affirm the conviction if any rational trier of fact could find the defendant guilty. *Id.*

A physician commits health care fraud if he knowingly and willfully executes a scheme to defraud a health care benefit program. 18 U.S.C. § 1347(a). The statute states in relevant part: "[I]f the violation results in death, such person shall be fined under this title, or imprisoned for any term of years or for life, or both." § 1347(a)(2). The jury must also find beyond a reasonable doubt the facts supporting the enhanced penalty under (a)(2). *See Apprendi v. New Jersey*, 530 U.S. 466 (2000).

Defendant contends that the government did not meet the standard of proof for establishing health care fraud resulting in death. Section 1347 does not indicate the level of causation required for imposition of the enhanced penalties under subsection (a)(2). However, in *United States v. Martinez*, 588 F.3d 301, 317 (6th Cir. 2009), *cert. denied*, 131 S. Ct. 538 (2010), this court held that proximate cause was the appropriate causation standard under the enhanced penalty provision of 18 U.S.C. § 1347:

> Our decision is also guided by the principles of proximate cause. "The concept of proximate cause incorporates the notion that an accused may be charged with a criminal offense even though his acts were not the immediate cause of the victim's death or injury." *Guillette*, 547 F.2d at 749. "In many situations giving rise to criminal liability," the harm "is not directly caused by the acts of the defendant but rather results from intervening forces or events." *Id*. "Where such intervening events are foreseeable and naturally result from [the defendant]'s criminal conduct," the defendant is "criminally responsible for the resulting harm." *Id.*; *see also Hoopengarner v. United States*, 270 F.2d 465, 469 (6th Cir. 1959) (holding defendant culpable for the "natural and probable consequence [ ]" of his conduct). Therefore, even if [the defendant] did not intend for his two patients to die, he can be held responsible for their deaths if there was sufficient evidence that it "reasonably might or should have been foreseen . . . that [his fraudulent conduct] would be likely to create a situation which would expose another to the danger of . . . death." *Id.; see also Harris*, 701 F.2d at 1102 (holding that "if death results" requirement under § 241[was] satisfied because death was "a foreseeable and natural result" of defendant's actions).

*Id.* at 319. Furthermore, a patient's use of illegal narcotics is not an intervening cause which breaks the chain of proximate causation if it is a foreseeable and natural result of the defendant physician's criminal conduct. *Id.* at 321.

As a threshold matter, Defendant complains that the district court did not give a specific instruction about proximate cause, as Defendant requested, but instructed the jury to consider whether the United States had proven, beyond a reasonable doubt, that Lindsey's and Brogan's deaths "resulted from" Defendant's health care fraud.

-4-

An issue regarding jury instructions is a question of law that is reviewed de novo. *United States v. Gunter*, 551 F.3d 472, 484 (6th Cir. 2009) (citing *Williams ex rel. Hart. v. Paint Valley Local Sch. Dist.*, 400 F.3d 360, 365 (6th Cir. 2005)). The district court's refusal to give a requested instruction is reviewed for abuse of discretion. *Id.* An abuse of discretion occurs if the requested instruction (1) was a correct statement of the law, (2) was not substantially covered by the charge actually delivered to the jury; and (3) concerned a point so important that the failure to give it substantially impaired the defendant's defense. *Id.* (citing *United States v. Williams*, 952 F.2d 1504, 1512 (6th Cir. 1991)).

*Martinez* was decided on December 1, 2009, after the jury trial in this case.[1] In its instructions, the district court tracked the language of § 1347(a)(2). We find no abuse of discretion because the issue and applicable law, as defined in *Martinez*, were "substantially covered by the charge actually delivered to the jury," *see Gunter*, 551 F.3d at 484, and the court's instructions were not misleading or confusing, *see United States v. Pensyl*, 387 F.3d 456, 458 (6th Cir. 2004).

Turning to his principal argument, Defendant maintains that the government did not meet its burden of proving beyond a reasonable doubt that his criminal conduct was the proximate cause of Lindsey's and Brogan's deaths. Instead, he claims the government proved merely that he prescribed controlled substances for each of the deceased, at some time prior to their death. Based upon our review of the record, we reject this argument.

As to patient Lindsey, the record establishes that, at the time of her death, Lindsey had a lethal amount of methadone in her system. Defendant's patient records reflected that she was his

---

[1]The district court's order denying Defendant's motion for new trial and amended motion for judgment of acquittal was issued on July 27, 2010.

patient and a TennCare recipient; that she received prescriptions for methadone and Xanax (alprazolam); that she filled the prescriptions on August 16, 2003; that TennCare paid for the drugs (*id.* at 16-19); and that Lindsey died from a methadone overdose on August 17, 2003. Lindsey's blood contained methadone at a concentration of 0.71 micrograms per milliliter, a toxic to lethal range. At trial, Dr. Kenneth Ferslew, a professor of pharmacology and toxicology at East Tennessee State University's Quillen College of Medicine and director of the toxicology section at the Jenkins Forensic Center, explained how methadone creates a substantial risk of central nervous system depression. After reviewing the laboratory report of Lindsey's blood sample, he opined that the level of methadone in Lindsey's blood was "potentially lethal."

Dr. Stephen Loyd, a physician and assistant professor of internal medicine at East Tennessee State University's Quillen College of Medicine, reviewed Lindsey's file. Dr. Loyd stated that Lindsey had a diagnosis of chronic low back pain. (*Id.* at 69.) She also had "multiple red flags for addictive behavior," (*Id.* at 67), but no history of drugs or alcohol was ever taken, nor was a mental status examination ordered. (*Id.* at 67-71.) Dr. Loyd testified that it was dangerous to treat pain by using methadone, given the long-acting nature of that drug. He explained that opiates (such as methadone) and benzodiazepines are both depressants of the central nervous system and can result in death. After reviewing Lindsey's file, Dr. Loyd opined that the drugs prescribed by Defendant were outside the scope of accepted medical practice, and that she died of "apparent drug overdose," based on "positive toxicology reports." (*Id.* at 67-78.)

As to patient Brogan, the record establishes that he died as a result of the fatal combination of morphine and other drugs, all prescribed by Defendant. According to Defendant's records, Brogan had his last appointment with Defendant on September 26, 2003, at which time Defendant

prescribed him MS Contin (morphine), Valium (diazepam), Elavil (amitriptyline), and other drugs. The prescriptions were filled that same day and paid for by TennCare. (*Id.* at 21-23.) Brogan died in October 2003.

Dr. Loyd reviewed Brogan's patient file. Dr. Loyd testified that Defendant had not prepared a patient history, had not done a physical examination, had not ordered imaging, and had not screened Brogan for substance abuse. Defendant gave a diagnosis of chronic low back pain and gave Brogan prescriptions for five drugs with central nervous system depressant effects. Dr. Loyd gave his opinion:

> My summary was that Mr. Brogan lacked the history, physical examination and diagnosis to support chronic narcotic use and escalation of dosage. He was on multiple opiates which caused respiratory suppression without discussion taking place about the possibilities. There's no psychiatric evaluation, mental exam or diagnosis to support the prescriptions of Xanax and Elavil, particularly at a 150 milligram dose. . . .

> Mr. Brogan had a crescendo pattern of narcotics use. . . . He requested higher dosages and more frequent administration. . . . His complaints were dramatic and not supported by history, physical examination or imaging. . . . In my opinion the use of narcotics in this case was outside the scope of accepted medical practice.

Dr. Alfredo Paredes, a forensic pathologist and senior medical examiner for the State of Alabama, testified that he participated in Brogan's autopsy. Toxicological testing showed the presence of amitriptyline, nortriptyline (a metabolite of amitriptyline), benzodiazepines, and opiates (morphine) in Brogan's system. (*Id*. at 29.) Dr. Ferslew testified to the same effect. A gastric drug screen revealed the presence of the same drugs, with the opiate being morphine. Dr. Paredes explained how opiates depress the central nervous system, along and in combination with other drugs, such as benzodiazepines. Dr. Paredes testified that Brogan "died from multiple drug toxicity or drug interaction; that is the presence of the antidepressant, amitriptyline, which by the way was

in a toxic range according to the toxicology report, and the presence of opiates and benzodiazepine." In his opinion, "all these drugs combined, I . . ., produced on him a fatal reaction, whether it be through the respiratory system or through the cardiovascular system in the way of arrhythmias." (*Id.* at 31.) On cross-examination, Dr. Paredes testified that Brogan died from the toxic interaction of opiates, benzodiazepines, and amitriptyline. (*Id.* at 33.) He explained that pulmonary edema, which was found in Brogan's body, was a "cardinal sign" of multiple drug toxicity. (*Id.* at 42.) Dr. Paredes also stated that there were no other indications of trauma or natural disease that could have explained Brogan's death. (*Id.* at 26.)

Lindsey and Brogan died shortly after being unlawfully prescribed Schedule II controlled substances, namely methadone and morphine, by Defendant. Expert testimony established that at the time of death, Lindsey had a lethal amount of methadone in her system. Expert testimony further established that Brogan died as a result of the fatal combination of morphine and other drugs, all prescribed by Defendant. The record supports the jury's finding, which was consistent with the language of the statute and the jury instructions, that Lindsey's and Brogan's deaths "resulted from" health care fraud. Viewing the evidence in the light most favorable to the government, a rational jury could have concluded that Lindsey's and Brogan's deaths were a natural and foreseeable result of Hancock's criminal conduct. *Cf. Martinez*, 588 F.3d at 319-23 (holding that the evidence supported the jury verdict that the defendant's criminal conduct under § 1347 "resulted in" the death of two patients).

### III. Conclusion

For the reasons stated, we **AFFIRM** Defendant's convictions.